UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AMERICAN SEATING COMPANY,
a Delaware corporation,

        Plaintiff,

                                    File No.  1:01-CV-578

v.

                                    HON. ROBERT HOLMES BELL

USSC GROUP, INC., a  Pennsylvania
corporation;, and CHRISTIAN
HAMMARSKJOLD, an individual

        Defendants.

_____/


**O P I N I O N**

      This patent case is before the Court on cross-motions for summary judgment on the

issues of invalidity and infringement.


**I.**

      Plaintiff American Seating Company ("American Seating") filed suit against

Defendants USSC Group, Inc. and its president, Christian Hammarskjold (together referred

to as "USSC"), alleging infringement of three patents owned by American Seating , including

American Seating's U.S. Patent No. 5,888,038 (the '038 patent).  This Court previously

entered summary judgment in favor of USSC on all three of American Seating's patent

infringement claims.[1]  The Federal Circuit affirmed the judgment in part, reversed in part, and remanded for further consideration.[2]

Only the '038 patent is at issue in the present cross-motions.  The '038 patent, which is entitled "Tie-Down for Wheelchairs," covers a wheelchair restraint system for use in public transportation.  American Seating seeks summary judgment on its claim that USSC's wheelchair restraint device known as the VPRoI infringes the '038 patent.  USSC seeks summary judgment on its contention that the '038 patent is invalid because the invention was in public use more than one year before American Seating filed its patent application.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to

---

[1] January 30, 2003 Opinion and Judgment (Enslen, J.) (Docket #'s 83 & 84).

[2] *American Seating Company v. USSC Group, Inc.*, No. 03-1429, 2004 WL 363341 (Fed. Cir. Feb. 26, 2004) (unpublished).  With respect to the '038 patent, the Federal Circuit reversed the judgment that USSC's VPRoI system does not literally infringe the '038 patent, affirmed the judgment that USSC's VPRoII system does not literally infringe the '038 patent, and remanded the issue of whether or not the VPRoII infringes the '038 patent under the doctrine of equivalents.

interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III.

The Court will first address USSC's motion for summary judgment on the basis of invalidity. A person is not entitled to a patent if the invention was "in public use" more than one year prior to the date of the application for patent. 35 U.S.C. § 102(b). USSC, as the party challenging the patent on the basis of prior public use, bears the burden of establishing invalidity by facts supported by "clear and convincing evidence." *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1378 (Fed. Cir. 2004).

"Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Id.* at 1379 (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)).

> In determining whether an invention was in public use, a court "must consider how the totality of the circumstances comports with the policies underlying the on sale and public use bars," including "discouraging the removal of inventions from the public domain which the public justifiably comes to

believe are freely available, prohibiting an extension of the period for exploiting the invention, and favoring prompt and widespread disclosure of inventions."   Additional factors a court must consider and weigh in determining whether the use was "public" under § 102(b) include, inter alia, "the nature of the activity that occurred in public; the public access to and knowledge of the public use; [and] whether there was any confidentiality obligation imposed on persons who observed the use . . . ."  The presence or absence of a confidentiality agreement is not dispositive of the public use issue, but "is one factor to be considered in assessing all the evidence."

*Bernhardt*, 386 F.3d at 1379 (citations omitted).

A provisional patent application was filed on December 2, 1996, for the invention claimed in the '038 patent.  Accordingly, any public use before December 2, 1995, would invalidate the patent.

The history of the invention covered by the '038 patent is not in dispute.  The inventors of the '038 patent are James Ditch ("Ditch") and Frereidoun Razavi ("Razavi").  Ditch was the Director of Maintenance for the Long Beach Transit Authority ("Long Beach Transit").  In order to keep his buses in service, Ditch was required to ensure that the buses met the wheelchair accessibility requirements under the Americans with Disabilities Act.  Ditch found that the systems available on the market for securing wheelchairs on public transportation were inconvenient and time consuming, and that the straps for securing the wheelchairs were frequently lost or stolen.  (Ditch dep. at 29-30).  Ditch conceived of a new approach for wheelchair restraints.  In July 1994 he directed the Long Beach Transit body shop to make the first prototype of his invention with retractable straps and a vertically pivoting movable securing element.  (USSC Br. Ex. 4, Answer to Interrog. 3).

Razavi was the owner of Cinedyne, a company that refurbished buses for Long Beach Transit. Because Long Beach Transit did not have an engineering department or a machine shop, Ditch approached Razavi for assistance in developing the restraint system. Specifically, Ditch needed Razavi's expertise on engineering factors such as selection of materials, strength and load requirements and he needed financing. (Ditch dep. at 39, 53-57; Razavi dep. at 28). Cinedyne hired CL Machine, a local machine shop, to make some of the stainless steel parts for the prototype. A prototype with a telescoping movable securing element was made in July 1995. (USSC Br. Ex. 4, Answer to Interrog. 2). A prototype with a horizontally pivoting movable securing element was made in September 1995. *Id.* In 1995 the prototype with the telescoping arm was installed on a Long Beach Transit bus for testing. The bus was never placed in service with the prototype installed. (Ditch dep. at 59-60).

Ditch and Razavi realized there was a large market for the device and that they did not have the capability of producing the new device on a large scale. In October 1996 Ditch and Razavi agreed to license their invention to American Seating in return for payment of royalties. Razavi made 26 restraints in 1996 as the initial retrofit of Long Beach Transit's buses. Ditch did not receive royalties on the restraints sold to his employer. Long Beach Transit now buys all of its restraints from American Seating. American Seating applied for its provisional patent application in December 1996.

USSC focuses on the following "undisputed" facts in support of its motion for summary judgment on the issue of invalidity: 1) the wheelchair restraint system embodied

5

in the '038 patent was reduced to practice with the creation of the first prototype in July 1994;

2) the wheelchair restraint system prototype was placed in a public bus belonging to Long

Beach Transit and was shown to others before December 2, 1995, and 3) American Seating

has admitted that the placement of the prototype for the wheelchair restraint system in a bus

constituted a public use.  (USSC Br. Ex. 5, p.5).

      USSC's contention that American Seating has admitted a public use before

December 2, 1995, is not supported by the evidence.  The interrogatory answer USSC relies

on for the alleged admission states:

> The first public disclosure of the subject matter of the '038 patent was in
> March 1996, when Jim Ditch installed and operated a prototype wheelchair tie-
> down on a Long Beach Transit bus.

(USSC Br. Ex. 5, Answer to Interrog. 7).  Although there is evidence that a prototype was

also placed on a bus prior to December 1995, American Seating has not admitted that the pre-

December 1995 placement constituted a public use.  In fact, the undisputed evidence reveals

that the 9302 bus on which the prototype with the telescoping arm was installed in 1995 was

a bus that had been taken out of service.  (Ditch dep. at 65).  The prototype installed on that

bus was only demonstrated to internal staff at Long Beach Transit.  (Ditch dep. at 60).  There

is no evidence that the prototype was disclosed to the public.

      Even without an admission of public use before December 1995, USSC contends that

the '038 patent is invalid because the invention was disclosed to the public without limitation,

restriction or any obligation of secrecy before December 2, 1995.  Specifically, USSC

contends that its was disclosed to Long Beach Transit employees who assisted in manufacturing the first prototype in July 1994; to CL Machine employees who assisted Razavi; to Frank Bertholet, a draftsman who assisted Razavi in making detailed sketches of the invention; to workers at Long Beach Transit and Cinedyne who viewed and used the invention on the bus; to Ditch's brother who demonstrated the invention; to the photographer who took pictures of Ditch's brother; and to bus drivers, mechanics and management at Long Beach Transit.  None of these people signed confidentiality agreements.

American Seating contends that although there were no confidentiality agreements, all those to whom the invention was disclosed were in an implied confidential relationship arising out of their employer/employee or agent/principal relationships, such that they understood that they were not free to put the invention to their own use.

USSC relies on *Baxter Int'l, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054 (Fed. Cir. 1996), in support of its assertion that the disclosure to co-employees is not protected.  In *Baxter* a research scientist at the National Institutes of Health ("NIH") began using the invention, a centrifuge that separated blood into its components, in his lab at NIH for more than a year before the invention was patented.  The Federal Circuit concluded that there was public use:

> Suaudeau's lack of effort to maintain the centrifuge as confidential coupled with the free flow into his laboratory of people, including visitors to NIH, who observed the centrifuge in operation and who were under no duty of confidentiality supports only one conclusion: that the centrifuge was in public use.

*Id.* at 1059.

USSC also relies on *Lough v. Brunswick Corp.*, 86 F.3d 1113 (Fed. Cir. 1996), where the plaintiff, while employed as an engine repairman at a marina, developed an improved upper seal assembly for a boat motor. The plaintiff made six usable prototypes and installed them in his own boat, the boat of the owner of the marina where he worked, the boat of a marina customer, and in the boats of friends. *Id.* at 1116. For over a year he neither asked for nor received any comments about the operability of the prototypes. *Id.* The Federal Circuit held that the district court erred in denying Brunswick's motion for judgment as a matter of law on the issue of public use. *Id.* aa 1119. Although an inventor is free to test his invention to verify that it worked for its intended purpose, the Federal Circuit held that the inventor "was required to maintain some degree of control and feedback over those uses of the prototypes if those tests were to negate public use." *Id.* at 1122. The inventor had "in effect provided the prototype seal assemblies to members of the public for their free and unrestricted use." *Id.*

Neither *Baxter* nor *Lough* is controlling. There are other cases involving more similar facts that are more helpful to the analysis in this case. For example, in *Bernhardt* the inventor showcased its new furniture designs at a "Pre-Market" exhibition for its key customers. 386 F.3d at 1374. Although Pre-Market attendees were not required to sign a confidentiality agreement, the Pre-Market was not open to the public but was limited to a select list of invitees. The attendees understood that their participation in future Pre-Markets was conditioned on maintaining confidentiality. They were escorted through the showroom

and were not permitted to make written notes or to take photographs. *Id.* at 1381. The Federal Circuit reiterated that the presence or absence of a confidentiality agreement is not dispositive of the public use issue, and vacated the district court's finding of invalidity because its analysis of the public nature of the exhibition was incomplete. *Id.* at 1381.

In *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986), the Federal Circuit affirmed the district court's determination that the inventor's display of a prototype of his three dimensional puzzle to other people without any mention of secrecy did not render the patent invalid on the basis of public use. *Id.* at 1265-66. The district court found that the puzzle was only disclosed to people with whom the inventor had a personal relationship, that none of those to whom it was disclosed had any basis for inferring that it was being disclosed for their free and unrestricted use, and that the inventor retained control over the puzzle's use and the distribution of information concerning the puzzle. *Id.*

Upon review of the facts of record this Court concludes that the facts of this case are closer to *Bernhardt* and *Moleculon*, than to *Baxter* and *Lough*. As the director of maintenance Ditch had the responsibility of solving the problem of wheelchair restraints. He invented a solution when he could not find what he wanted on the market. Although Long Beach Transit did not ask Ditch to invent the system, Ditch's invention was not independent of his duties as an employee of Long Beach Transit. Ditch discussed the invention with Long Beach Transit employees and was able to use the Long Beach Transit body shop to

manufacture the first prototype because this was a project aimed at solving a Long Beach Transit problem.

With respect to Ditch's disclosure of the invention to Razavi, although there was no confidentiality agreement, Razavi understood the matter was "just between him and I." (Razavi dep. at 35).  Disclosure to others was limited.  Ditch disclosed the invention to people at Long Beach Transit for purposes of obtaining their input so that he could develop an invention that would adequately respond to the needs of the users.  Razavi disclosed the invention to individuals hired to assist him in the manufacturing process.

Unlike *Baxter*, there is no evidence in this case that there was a free flow of people unconnected with the development of the invention who observed the invention in use.  The invention was not revealed to the public at large.  The bus on which the prototype was attached prior to December 1995 was not in service.  There is no evidence that the public was free to roam the Cinedyne facility or the bus garage where the prototype was located. Employees at Long Beach Transit and at Cinedyne who viewed the invention undoubtedly understood that it was their employer's project and that they did not have a right to use the invention for their own personal benefit.  The others to whom it was disclosed, such as the draftsman, welder and photographer, were in a principal agent relationship.  They understood that they were not free to confiscate the design for their free and unrestricted use.

Unlike *Lough*, there was only one prototype in existence at any given time, and it did not leave the control of the inventors.  The prototype was only revealed to individuals who

were working with and assisting the inventors in developing the prototypes or with whom the inventors had a personal relationship.  None of those to whom it was disclosed had any basis for inferring that it was being disclosed for their free and unrestricted use.  They would have understood that there was an implied duty of confidentiality and that they were not free to market the invention for their own benefit.

As previously noted, the policies underlying the public use bar include discouraging the removal of inventions from the public domain which the public justifiably comes to believe are freely available, prohibiting an extension of the period for exploiting the invention, and favoring prompt and widespread disclosure of inventions.  *Bernhardt*, 386 F.3d at 1379.  None of these policies are implicated by the very limited use and disclosure of the wheelchair restraint system covered by the '038 patent prior to December 2, 1995.  There was no disclosure that would have enabled the public to justifiably believe that the invention was freely available, and there was no prolonged delay in patenting the invention.

Upon review of all the facts of record against the backdrop of the public use doctrine, the Court concludes that USSC has not come forward with sufficient evidence to meet its burden of proving by clear and convincing evidence that any use prior to the critical date can properly be considered "public."  Accordingly, USSC's motion for summary judgment in its favor on the basis of the invalidity of the '038 patent must be denied.

## IV.

USSC manufactures a competing wheelchair restraint system for installation in buses known as the VPRoI.  American Seating has filed a motion for summary judgment in its favor on its claim that USSC's VPRoI literally infringes Claims 1, 2 and 9 of the '038 patent. This Court previously found that the VPRoI did not infringe the '038 patent, but that finding was reversed on appeal because the Federal Circuit determined that it was based on an incorrect construction of the claims.  In its renewed motion for summary judgment American Seating contends that pursuant to the claim construction established by the Federal Circuit, this Court must now find that the VPRoI literally infringes Claims 1, 2, and 9 of the '038 patent.

A literal patent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused product infringes the asserted claim as properly construed.  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996).  Claim construction is a matter of law within the exclusive province of the court.  *Markman v. Westview*, 517 U.S. 370, 372 (1996).  "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point [ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*  334 F.3d 1294, 1298 (Fed. Cir. 2003) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed. Cir.

2001)).  "As a general rule, terms in a patent claim receive their plain, ordinary, and accepted

meaning within the community of those of ordinary skill in the relevant art."  *Leggett & Platt,*

*Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002).

American Seating asserts that the VPRoI infringes Claims 1, 2 and 9 of the '038

patent.  Claim 1 provides:

> 1.  In combination,
> (a) a vehicle having an area for receiving a wheelchair, and
> (b) means for securing a wheelchair in said area to said vehicle, wherein said
> means for securing is permanently attached to said vehicle and comprises:
>> (i) means for engaging a portion of said wheelchair under tension, said
>> means for engaging being **locked to said vehicle** at a predetermined
>> location, and
>> (ii) a movable securing element having mounted thereon a housing and
>> a flexible strap, said flexible strap having one end adjustably received
>> in said housing and an opposite end adapted to engage a portion of said
>> wheelchair in said area under tension, said movable securing element
>> being movable with respect to said vehicle between an operating
>> position wherein said housing is **locked to said vehicle** at a further
>> location for cooperation with said means for engaging to secure said
>> wheelchair and a storage position wherein said housing is remote from
>> said further location.

'038 Patent Claim 1 (emphasis added).

In the prior opinion this Court held that because the locking mechanism of the VPRoI

did not directly interface with the vehicle, the VPRoI was not "locked to the vehicle" and

accordingly did not infringe the '038 patent (Jan. 30, 2003, Op. at 14-15).  The Federal

Circuit rejected this construction.  The Federal Circuit held that the requirement that the

"means for engaging" the wheelchair be "locked to the vehicle" only required that it be

attached to structures that are permanently attached to the vehicle.  2004 WL 363341 at *2.

Because there was evidence that the VPRoI's means for engaging the wheelchair is attached to structures that are permanently attached to the vehicle, the Federal Circuit held that summary judgment of noninfringement could not be sustained.  *Id.*

American Seating contends that when Claim 1 is read without reference to a requirement that the locking mechanism "directly interface" with the vehicle, it is clear that USSC's VPRoI restraint system meets every element of Claim 1.

The VPRoI has 4 retractable straps, each of which has a hook for engaging a portion of a wheelchair.  Two straps are mounted directly to the vehicle and engage the rear of the wheelchair.  The two remaining straps are connected to a U-shaped base bolted to the vehicle floor and engage the front of the wheelchair.  The U-shaped base has two pivoting arms which rotate between a vertical stored position and a horizontal deployed position.  Each arm has a spring-loaded operating shaft with a knob and a guide pin.  The arms are maintained in either the vertical stored or horizontal deployed position by retracting a shaft and disengaging the guide pin from one notch and rotating the arm until the tension on the spring forces the guide pin into a second notch.  *See* USSC Br. in Opp. at p. 2.

According to American Seating, this combination of elements meets all of the elements of Claim 1 because it includes a means for engaging the wheelchair under tension that is locked to the vehicle at a predetermined location, and another securing element that is movable between an operating position that is locked to the vehicle and a storage position.

USSC opposes a finding of literal infringement.  USSC contends that the VPRoI does not infringe the '038 patent because the limitations of claim element b(i) are not met. According to USSC, the VPRoI's rear straps and hooks which are carried in housings attached to the vehicle, are permanently attached to the vehicle.  USSC contends that these rear straps and hooks are not "locked to the vehicle" as required by element b(i) of Claim 1 because they cannot be readily unlocked.  In support of this argument USSC relies on this Court's construction of the term "locked to said vehicle"as used in the '038 patent in the prior case of *American Seating Co. v. Transportation Seating Co., Inc. ("TSI")*, Case No. 1:00-CV-322 (W.D. Mich. Aug. 8, 2001) (Enslen, J.), *aff'd* 2003 WL 1795638 (Fed. Cir. 2004).   In *TSI* this Court construed "locked to said vehicle" as used in the '038 patent to mean "made immobile with respect to the vehicle by use of a mechanical means, the means engaging the vehicle in some manner, **which means can be disengaged by mechanical force applied by an operator or user**." *TSI*, Findings of  8/1/01 at 4-5 (emphasis added). This Court adopted the *TSI* construction of the term "locked" in its prior opinion in this case. Jan. 30, 2003 Op. at 10-12.

As a preliminary matter, USSC's argument ignores this Court's prior determination that the VPRoI's "means for engaging" the wheelchair was a "locking mechanism" that interfaces with a sidewall or bulkhead of the vehicle.  (July 30, 2003 Op. at 14-15).  In other words, this Court has already determined that the rear straps on the VPRoI do meet the requirement in claim element b(i) that they be "locked" to the vehicle.  USSC has also failed

to indicate any language in the '038 patent that would suggest that the securing element in b(i) must be able to be readily unlocked by operators or passengers.

Furthermore, USSC's focus on the ability to unlock is taken out of context. This Court specifically noted that it could "discern nothing that would indicate the term 'locked' should be accorded anything other than its ordinary meaning." *TSI* Findings of 8/1/01 at 4. It is useful to consider the language quoted by USSC together with the language preceding it:

> "[L]ocked to said vehicle," as used in the '038 in the claim section, means just what an ordinary reader would expect. Namely, "locked" means that the movable securing element is "fix[ed] in place so that [its] movement . . . is impossible." Simply understood, "locked to said vehicle" means the movable securing element is made immobile with respect to the vehicle by use of a mechanical means, the means engaging the vehicle in some manner, which means can be disengaged by mechanical force applied by an operator or user.

*TSI* Findings at pp. 4-5. This Court further noted that the term "locked" did not imply "any sort of limitation on how the locking mechanism was to be constructed or function or where it is to be located on the movable securing element." *Id.*

The emphasis of this Court's construction of the term "locked" in *TSI* was not on the ability to unlock, but on making movement impossible. The term "locked to said vehicle" is used twice in Claim 1. When this Court construed the term "locked to said vehicle" in *TSI* this Court was concerned only with the use of the phrase in claim element b(ii). Because claim element b(ii) involves the movable securing element, this Court also observed that the locking mechanism would also have to be capable of being unlocked or disengaged. However, because claim element b(ii) requires the movable securing element to be locked

in the operating position and then moved back to a storage position, the ability to unlock can be inferred from other language within claim element b(ii).  In other words, the ability to unlock was not essential to the construction of the term "locked," even in claim b(ii).  Significantly, on appeal in the *TSI* case the Federal Circuit merely noted that "'Locked' means 'fixed in place so that movement is impossible.'"  2003 WL 1795638 at **5.  The Federal Circuit did not discuss the additional language phrase regarding the ability to disengage the lock.

USSC contends that because the term "locked to said vehicle" is found in both claim element b(i) and in claim element b(ii), it should be construed in the same manner in both claim elements.   According to USSC, the term "locked to said vehicle" in claim element b(i) must similarly be construed to require the ability to be disengaged or readily unlocked.

It is a general rule of construction that "the same word appearing in the same claim should be interpreted consistently."  *Digital Biometrics, Inc. v. Identix, Inc.* 149 F.3d 1335, 1345 (Fed. Cir. 1998).  However, "where the language of the written description is sufficient to put a reader on notice of the different uses of a term, and where those uses are further apparent from publicly-available documents referenced in the patent file, it is appropriate to depart from the normal rule of construing seemingly identical terms in the same manner. This entirely accords with the public notice function of claims."   *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1311 (Fed. Cir. 1999).

17

Claim elements b(i) and b(ii) have a critical distinction. The housing that is the subject of subparagraph b(ii) is expressly movable. The housing that is the subject of subparagraph b(i) is neither expressly stationary nor expressly movable. Thus, claim element b(i) requires that the "means for engaging" be "locked to said vehicle at a predetermined location," while claim element b(ii) requires that the housing mounted on the movable securing element be "locked to said vehicle at a further location."

In light of the distinction between claim element b(i) and claim element b(ii), it is clear that the ordinary definition of "locked" as fixed in place so that movement is impossible should be applied to claim element b(i). Under this construction, there is no question that the VPRoI meets all the elements of Claim 1 of the '038 patent.

Claim 2 of the '038 patent is dependent on Claim 1 and reads as follows:

2. A combination according to claim 1 wherein said means for engaging comprises a housing and a strap adjustably received in said housing.

'038 patent, col. 7.

Claim 9 of the '038 patent is also dependent on Claim 1 and reads as follows:

9. A combination according to claim 1 further comprising latch means for holding said movable securing element in said operating position when such latch means is engaged and for allowing said movable securing element to be moved to said storage position when said latch means is disengaged.

'038 patent, col. 8.

USSC asserts that because claim element b(i) of Claim 1 is not met, dependent Claims 2 and 9, which include all the limitations of Claim 1, are not infringed. This argument must

be rejected in light of this Court's determination above that the VPRoI does infringe Claim 1. USSC does not deny that the VPRoI contains a housing and a strap adjustably received in the housing as described in Claim 2.  USSC does assert, however,  that the VPRoI does not meet the limitations of Claim 9.

The '038 patent discloses that the means for holding the movable securing element in the storage and operational positions may be any of several designs.  '038 patent, col. 2 ll. 20-22.  The preferred design is a vertically-movable pin that engages in an aperture in the floor plate.  '038 patent, col. 2, ll. 23-26.  However, other means may be used, including a disk with apertures for cooperating with a removable pin.  '038 patent, col 2, ll. 43-52. According to USSC neither the pin and floor plate arrangement nor the disk and pin arrangement described in the '038 patent can be found in the VPRoI.

USSC has described the means for securing the movable arms in the VPRoI as "a combination of the notch, guide pin and spring tension."  (USSC Br. in Opp. (Docket #  154 at 2).  American Seating's expert, Charles F. Reinholtz, has compared the VPRoI locking mechanism to the '038 patent.  He states:

> The VPRO I locking mechanism is essentially the same type of locking mechanism as the preferred embodiment of the '038 patent.  Moreover, the type of locking mechanism in the VPRO I is insubstantially different from the alternative example of the '038 patent that utilizes an apertured disk on the movable securing element.

Reihholtz Aff. at ¶ 11.

Upon review this Court agrees that the VPRoI locking mechanism is covered by Claim 9 of the '038 patent. The VPRoI locking mechanism consists of a spring-loaded operating shaft with a knob and guide pin that fits into notches. The movable arms are maintained in either the vertical stored or horizontal deployed position by retracting a shaft and disengaging the guide pin from one notch and rotating the arm until the tension on the spring forces the guide pin into a second notch. This mechanism is essentially the same as the locking mechanism described in the '038 patent.

USSC also contends that its own patent, U.S. Patent No. 6,776,564 (the '564 patent) for a vertically-pivoting wheelchair restraint, provides an alternative basis for denying American Seating's motion for summary judgment of infringement. In the course of the prosecution of the '564 patent, the Patent Office found the USSC system patentably distinct from the '038 patent. According to USSC, the '564 patent creates an issue of fact as to whether or not the two inventions are substantially different such that the VPRoI does not infringe the '038 patent.

"The fact of separate patentability presents no legal or evidentiary presumption of noninfringement." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1582 (Fed. Cir. 1996). Nevertheless, while not conclusive on the issue, the fact of separate patentability may be relevant to the issue of the substantiality of the differences. *Minnesota Scientific, Inc. v. Thompson Surgical Instruments, Inc.*, 2001 U.S. Dist. LEXIS 914 (W.D. Mich. 2001)

(Bell, J.).  This is particularly true where, as in *Minnesota Scientific*, the structure actually patented was the structure alleged to be significantly different.

USSC contends generally that separate patentability is relevant, but USSC has not shown that the difference it points out in connection with this motion, i.e., whether the rear straps of the VPRoI are locked to the vehicle as required by element b(i) of Claim I, was addressed in its '564 patent.  During the prosecution of the '564 patent USSC distinguished its invention from American Seating's '038 patent on the basis that the '038 patent teaches a single movable securing element, whereas the '564 patent required two arm members.  There was no consideration of the locking and unlocking issue raised in this motion.  Accordingly, the '564 patent does not create an issue of fact on infringement.

This Court concludes that the VPRoI infringes Claims 1, 2 and 9 of the '038 patent and that American Seating is entitled to summary judgment of infringement.

An order and partial judgment consistent with this opinion will be entered.


Dated:   ___May 23, 2005___                    _/s/ Robert Holmes Bell_____
                                               ROBERT HOLMES BELL
                                               CHIEF UNITED STATES DISTRICT JUDGE