UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN SEATING COMPANY,

    Plaintiff,

                                        Case No. 01-00578

-vs-                                   Hon:  AVERN COHN

USSC GROUP, INC.,

    Defendant.

_____/

**AMENDED[1]**
**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT'S[2] MOTION FOR**
**JUDGMENT AS A MATTER OF LAW, NEW TRIAL OR**
**REMITTITUR OF THE JURY VERDICT**

I.  Background

A.  History of the Case

    This is a patent case.  It was tried to a jury on the issue of damages following a ruling that defendant's VPro I tie-down[3] for wheelchairs in municipal passenger buses infringed plaintiff's U.S. Patent No. 5,888,038 (the '038 patent).  The background to the trial is described in three non-published decisions as follows, and will not be repeated here:

_____

[1]This Amended Opinion and Order supercedes the Opinion and Order filed August 22, 2005.  This opinion contains a more expansive description of the prior decisions in the case and corrects a typographical error on page twenty five from "metal A.R.M." to "metal arm" which now appears on page twenty six of this opinion.

[2]Plaintiff also sued Christian Hammarskjold, however, the Court at trial dismissed him as a defendant.  USSC Group, Inc. is the sole defendant.

[3]The patented product is sometimes referred to in the record as a wheelchair restraint system or restraint system.  For convenience, the patented product will be referred to in this Opinion as a tie-down.

- American Seating Co. v. USSC Group, 91 Fed. Appx. 669, 2004 WL 363341 (Fed Cir. Feb. 26th 2004) (finding a claim construction error and reversed a finding that the VPRo I did not literally infringe, affirmed a finding that the VPO II did not literally infringe and remanded the case because of a claim construction error to determine whether or not the VPO I literally infringed or the VPRo II infringed under the doctrine of equivalents)

- American Seating Co. v. USSC Group, 2005 WL 1224603 (W.D. Mich. May 23, 2005) (denying summary judgment to defendant on grounds of invalidity based on public use and granting summary judgment to plaintiff on the claim that the VPRo I literally infringed and left for trial the issues of pubic use and infringement by the VPRo II under the doctrine of equivalents)

- American Seating Co. v. USSC Group, 2006 WL 839093 (W.D. Mich. Mar. 27, 2006) (denying parties' cross motions for judgment as a matter of law and new trial following verdict that the VPO I literally infringed, the VPO II did not infringe under doctrine of equivalents and that the '038 patent was not invalid based on public use)

Now before the Court is defendants' motion for judgment as a matter of law, new trial or remittitur.  For the reasons that follow, the verdict on the convoyed sale will be set aside and an amended judgment in the amount of $676,850.00 entered.  In all other respects the motion will be denied.

## B.  The Verdict

The jury's verdict was in several parts.

1.

2

The jury awarded plaintiff, American Seating Company (ASC), lost profits of $1,366,612.00 on jobs ASC lost because of sales by defendant, USSC Group (USSC), of the infringing VPRo I.  This amount was divided into two parts:  $387,931.00 for lost profits on the sale of ASC's A.R.M. tie-down and $978,681.00 for lost profits on the sale of passenger seats (convoyed sales).

2.

The jury awarded also ASC lost profits of $959,517.00 on jobs ASC lost because of sales by USSC of the VPRo II tie-down which does not infringe.  These sales resulted from an offer by USSC to sell the VPRo I and then a switch at delivery to the VPRo II.  Again there were two parts to the verdict:  $288,919.00 for lost profits on the sale of the A.R.M. and $670,598.00 for lost profits on the sale of passenger seats (convoyed sales).

3.

A Consolidated Amended Final Judgment in the amount of $2,326,129.00 was entered on July 17, 2006.

II.  The Pending Motion

The essence of the motion is as follows.

ASC was awarded damages by the jury on the sale by USSC of infringing tie-downs and non-infringing passenger seats in buses sold to 14 municipalities and transit authorities for 19 discrete jobs.  ASC would have been awarded these jobs had USSC not offered for sale or sold the VPRo I.  The evidence at trial as not sufficient to support the jury finding that

> (a)    but for the infringing sale by USSC, ASC would have been awarded
>
> these jobs; and

3

(b)     there was not a sufficient functional relationship between the tie-down

and passenger seats to include the passenger seats as convoyed sales.

Additionally,

(a)     since the non-infringing VPRo II was available by at least April, 2003,

ASC was not entitled to lost profits after that date;

(b)     the jury was improperly instructed on what was included within the

patented tie-down and what constituted a convoyed sale; and

(c)     ASC's expert was improperly allowed to testify in ASC's case-in-chief.

### III.  Decision

The verdict on the convoyed sale will be set aside and an amended judgment in the

amount of $676,850.00 shall be entered.  In all other respects the motion will be denied.

As will be explained, the evidence at trial was not sufficient to support the jury's

finding that there was a functional relationship between the sale of the tie-down and the

sale of passenger seats as convoyed sales.  If the set aside of the verdict is held to be

improper, USSC is entitled to a new trial on the issue of convoyed sales as the Court is of

the firm opinion that it would be an injustice to allow ASC damages for convoyed sales to

stand.  See Portage II, et al. v. Bryant Petroleum Corp., et al., 899 F.2d 1514, 1524 (6th Cir.

1990) (noting importance, particularly for purpose of appellate review, of ruling on a motion

for a new trial in addition to a ruling on a motion for judgment as a matter of law).

However, the evidence at trial was sufficient to support the jury's verdict that if USSC

did not make the sales of the VPRo I, these sales would have gone to ASC.  The A.R.M.

was the only acceptable alternative tie-down in the market.  Thus, the jury's verdict on lost

profits stands.

4

As to USSC's other asserted grounds for judgment as a matter of law or a new trial, they lack merit.

The reasons follow.

## IV.  The Trial

### A.  The Witnesses

#### 1.

Testifying at trial for plaintiff were:

- James Ditch - an inventor of the '038 patent and Director of Maintenance for Long Beach Transit Authority, at whose facility the '038 tie-down was developed.  He testified by videotaped deposition.

- David Kiernan - USSC's engineering manager.  His deposition testimony was read into the record.

- Ralph Merced - Director of Maintenance for Santa Monica Transit Authority. He testified by videotaped deposition.

- Dennis Howard - president of Gillig Corporation, a bus builder.  He testified by videotaped deposition.

- David McLaughlin - a Vice President of ASC

- Kathleen Kedrowski - an expert witness

- Lee Peterson - a Regional Sales Manager of ASC

#### 2.

Testifying at trial for defendants were:

- Christian Hammarskjold - President of USSC

- Jeffrey Cohen - an expert witness

### B.  The Exhibits

#### 1.

5

The exhibits at trial included:  the patent in suit; brochures; illustrative materials relating to the operation of the A.R.M., VPRo I and VPRo II; exemplars of the A.R.M., VPRo I and VPRo II; exemplars of third parties' wheelchair restraint systems; exemplars of passenger seats; sales records and damages computations; job specifications for passenger buses; and USSC quotations.

## V.  Legal Standards

The law relating to a motion for judgment as a matter of law and for a new trial is well known and needs only a brief discussion.

### A.

The principle governing a motion for judgment as a matter of law under Fed. R. Civ. P. 50 is best stated in Morelock v. The NCR Corporation, 586 F.2d 1096, 1104 (6th Cir. 1978), which says that "[t]he issue raised by a motion for judgment n.o.v. is whether there is sufficient evidence to raise a question of fact for the jury."  In making this determination, "the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury," Id.  The motion should not be granted unless the court, after so viewing the evidence, "is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion. . . ."  Id. at 1104-05.

### B.

Under Fed. R. Civ. P. 59(a), a court may grant a motion for a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  This rule has been construed as encompassing such grounds as a verdict against the clear weight of the evidence, an inconsistent verdict, an excessive

6

award of damages, an error of law during the trial, or prejudicial misconduct by the court,

opposing counsel, or a juror that deprived the moving party of a fair trial.  See, Robert E.

Jones, et al, Fed. Civil Trials & Evidence, Ch. 20, ¶¶20:100-243 (2001 Ed.); Wight, Cooper,

Kane, Fed. Prac. & Procedure, Civil 2d §2807.  It is clear that a court has broad discretion

to decide whether to grant a new trial.  McDonough Power Equipment, Inc. v. Greenwood,

464 U.S. 548, 556 (1984).

Circuit Judge Taft, in an early Sixth Circuit case, Felton v. Spero, 78 F. 576, 581 (6th

Cir. 1897), put it this way:

> [T]he motion for new trial is a remedy accorded to a party
> litigant for the correction by the trial court of injustice done by
> the verdict of a jury.  It is one of the most important rights which
> a party to a jury has.  It is a right to invoke the discretion of the
> court to decide whether the injustice of the verdict is such that
> he ought to have an opportunity to take the case before
> another jury. . . .

## VI.  The Law of Lost Profits

The law of lost profits is described in Schwartz, Herbert F., Patent Law and Practice

§ 8A.IIA. (4th ed. 2003) as follows:

> The prevailing party in a successful suit for patent infringement
> is entitled to an award of profits lost because of diverted sales,
> price erosion, and increased costs, where provable.  Such an
> award is usually composed of profits lost by the patent owner
> rather than profits made by the infringer.
>
> To recover lost profits damages, a patent owner must show a
> reasonable probability that, but for the infringement, the patent
> owner would have made some or all of the infringer's sales.  It
> is unnecessary for the patent owner to rule out the possibility
> that purchasers might have bought another product.  A widely
> used way for a patent owner to prove entitlement to lost profits
> damages was articulated by former Chief Judge Markey, then
> of the Court of Customs and Patent Appeals, sitting by
> designation in the Sixth Circuit in Panduit Corp. v. Stahlin Bros.

<u>Fibre Works</u> [575 F.2d 1152, 1156 (6th Cir. 1978)].

> To obtain as damages the profits on sales he would have made absent the infringement, i.e., the sales made by the infringer, a patent owner must prove: (1) demand for the patented product, (2) the absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

In <u>Grain Processing Corporation v. American Maize-Products Co.</u>, 185 F.3d 1341 (Fed. Cir. 1999), the district court found that American Maize infringed a patent owned by Grain Processing in the sale of a food additive made from starch.  In affirming the district court's decision limiting Grain Processing's damages to a reasonable royalty because an acceptable non-infringing substitute was available or on the market, the Federal Circuit said:

> To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits.  When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement.  Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales." [citations omitted.]

<u>Id</u>. at 1349 (internal citations omitted).

...

> As this court stated [previously] "to be an acceptable non-infringing substitute, the product or process must have been available or in the market at the time of infringement."

<u>Id</u>. (internal citations omitted).

...

8

> Whether and to what extent American Maize's alleged alternative prevents Grain Processing from showing lost sales of Maltrin 100 depends not only on whether and when the alternative was available, but also on whether and to what extent it was acceptable as a substitute in the relevant market. [Citations omitted.]

Id. at 1355 (citation omitted).

## VII.  The Law of Convoyed Sales

The relationship between the sale of a patented product and a non-patented product, known as a convoyed sale, is reflected in the following precedents.

In Paper Converting Machine Co. v. Magna-Graphics Corporation, 745 F.2d 11 (Fed. Cir. 1984), the components were a patented high speed rewinder used in the manufacture of rolls of densely wound industrial toilet tissue and paper toweling, which was part of a complex mechanism for high speed manufacture of the rolls.  The other parts of the mechanism were not.  The Federal Circuit found that the evidence was sufficient to establish that the paper making industry routinely purchased a complete manufacturing line from the seller of the patented rewinder "so as to insure a single source of responsibility," Id. at 23.

In TWM Manufacturing Co., Inc. v. Dura Corp., 789 F.2d 895 (Fed. Cir. 1986), the components were a patented wheel suspension system enabling trucks to engage an additional axle and wheels to carry a heavy load and unpatented wheels and axles.  The Federal Circuit found the two to be "an entire apparatus containing several features," Id. at 901.  Additionally, it was not shown how "the special master could. . .have apportioned the infringing sales if such apportion had been appropriate," Id.

In Rite-Hite Corporation v. Kelly Co. Inc., 56 F.3d 1538 (Fed. Cir. 1998), the

9

components were a patented mechanism for restraining trucks to loading docks in the

loading and unloading process, and unpatented dock levelers which were sold with the

restraints.  The Federal Circuit said the two "were not sufficiently associated so that sales

of the dock levelers should be includ[ed]. . .within the compensation base," Id. at 1551.  In

so ruling the Federal Circuit said:

> All the components together must be analogous to components
> of a single assembly or be part of a complete machine, or they
> must constitute a functional unit.  Our precedent has not
> extended liability to include items that essentially have no
> functional relationship to the patented invention and that may
> have been sold with an infringing device only as a matter of
> convenience or business advantage.
>
> ...

Id. at 1550.

> Although the two devices may have been used together they
> did not function together to achieve one result and each could
> have effectively have been used independently of each other.
>
> ...

Id. at 1551.

> "The dock levelers were. . .sold. . .with the restraints only for
> marketing reasons, not because they essentially functioned
> together.

Id.

In Juicy Whip, Inc. v. Orange Bang, Inc., 382 F.3d 1367 (Fed. Cir. 2004), the

components were a patented post-mix beverage dispenser and non-patented syrup.  The

Federal Circuit said they were "in fact analogous to parts of a single assembly or complete

machine, as the syrup functions together with the dispenser to produce the visual

appearance that is central to  [the patent in suit]," Id. at 1372.  The Federal Circuit, citing

Rite-Hite, supra at 1550, said:

10

In <u>Rite-Hite</u>, we explained that the entire market value rule was a principle of patent damages that defined a patentee's ability to recover lost profits on unpatented components typically sold with a patented item.  Although the rule traditionally had been applied to permit recovery when both the patented and unpatented items were part of the same machine, we recognized that "the rule has been extended to allow inclusion of physically separate unpatented components normally sold with the patented components" with the caveat that both were "considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit."

<u>Id</u>. at 1370

VIII.  Jury Instructions

When a case is tried to a jury, the instructions state the law of the case.  Recital of the instructions is helpful to know what the jury was told about the case and the rules of law they were to apply to the facts as they found them.  Here the jury was instructed consistent with the law described above.  The relevant portion of the instructions follow.

[The Patented Product]

The patented product at issue in this case is American Seating's A.R.M. wheelchair restraint system that includes the restraint, belts, and barrier.  It does not include the passenger seats.

[USSC's Contention]

USSC contends that American Seating cannot establish that it is entitled to recover lost profits as a result of the infringement of the '038 patent because non-infringing substitutes for the A.R.M. were available, the customers who purchased the VPRo I system from USSC would have purchased the VPRo II system instead of American Seating's A.R.M., and the claim that USSC's customers would have purchased American Seating's product is based on speculation.  In addition, USSC contends that American Seating cannot establish that it had to lower its prices to meet competition because of the

11

infringement or that it would have sold other products such as bus seats if customers had decided to purchase the American Seating A.R.M. ...

[Jury's Obligation]

As I told you earlier, a determination has already been made that the '038 patent is valid and that USSC has infringed it by sales of its VPRo I system.  Now, you must determine the amount of damages to be awarded American Seating for the infringement.  The amount of those damages must be adequate to compensate American Seating for the infringement.  Your damage award should put American Seating in approximately the financial position it would have been in had the infringement not occurred... You may not add anything to the amount of damages to punish the accused infringer or to set an example.  American Seating has the burden of proving each element of its damages by a "more likely than not" standard of the evidence.

[Definition of Lost Profits]

... Briefly, lost profits damages compensate the patent owner for the additional profits that it would have made if the accused infringer had not infringed.  You may hear this referred to as the "but for" test...

[Lost Sales]

Lost sales are those sales the patent owner lost because of the infringement.

To prove that it lost sales, American Seating must prove that it was more likely than not that it would have made additional sales if USSC had not made the sales of the VPRo I.

American Seating may receive damages for lost sales only on its A.R.M. that competes with USSC's VPRo I product, and only on parts that are functionally part of American Seating's A.R.M.  American Seating may not receive lost profit damages for other products that might be sold along with the A.R.M. for convenience or business advantage, but that are not functionally part of the competing product.

12

[A Two Supplier Market]

If there are only two suppliers in the market, you may infer that American Seating has proven its lost profits if you find that American Seating has proven each of the following factors by a preponderance of the evidence:

1.      the demand for the patented product

2.      absence of acceptable noninfringing substitutes

3.      that American Seating had the capacity to make the infringing sales or a portion thereof that were made by USSC, and

4.      the amount of profit that American Seating would have made but for USSC's sales.

[Demand for the Product]

Demand for the patented product can be proven by significant sales of American Seating's A.R.M.  Demand for the patented product can also be proven by significant sales of USSC's product containing the patented features.  However, if you find that USSC generated new or different markets by sales efforts or by creating demand because of features other than those claimed by American Seating, the sales of USSC's VPRo I cannot establish a demand for the patented product.

[Acceptable Substitutes]

In order to be an acceptable substitute, the product must have the advantages of the patented invention that were important to customers.  If, however, the realities of the marketplace are that competitors other than American Seating would likely have captured some or all of the sales made by USSC, even despite a difference in the products, then American Seating is not entitled to lost profits on those sales.  A non-infringing substitute is a product that is or can be sold competitively in the marketplace, but which does not infringe the patent.  A product does not infringe a patent when it either (a) is sold based on a license under that patent or (b) does not include all the features required by the patent.  It is not necessary for an acceptable non-infringing substitute to be actually marketed or sold.  An acceptable non-infringing substitute is available if, during the

damages period, a competitor or USSC had all the necessary equipment, materials, know-how, and experience to design and manufacture the substitute and consumers would have accepted the substitute such that USSC could have sold such substitute instead of its infringing sales at the time those infringing sales were made.  If you determine that USSC's customers would just as likely have purchased a non-infringing acceptable product, then American Seating has not shown it lost that sale but for USSC's sales.

In order to assess whether there is an absence of acceptable non-infringing substitutes, you must consider whether non-infringing substitutes existed that were acceptable to the *specific* purchasers of the infringing products, not "purchasers" generally.  The test is whether purchasers of USSC's VPRo I were motivated to make their purchase by features available only from USSC's VPRo I (and not the patented product).  If so, non-infringing products without those features would not be "acceptable noninfringing substitutes," even if they otherwise competed in the marketplace with the patented and USSC's products.

It is not necessary for American Seating to prove that American Seating and USSC were the only two suppliers in the market for American Seating to demonstrate entitlement to lost profits.  If the realities of the marketplace are such that "acceptable noninfringing substitutes" were available from suppliers who would have made only some, but not all, of the sales that were made by USSC, then American Seating may be entitled to lost profits on a portion of the infringing sales.  The burden is on American Seating, however, to show to a reasonable probability that it would have sold that portion if USSC's VPRo I had never existed.  By the same token, even if you find that American Seating and USSC were the only two suppliers of products having the advantages of the A.R.M., it does not necessarily mean that American Seating would have made all USSC's sales.  The burden is on American Seating to show that its product competed in the same market with the USSC's VPRo I and that it would have made those sales if the infringement had not occurred.

[Capacity to Meet the Market]

American Seating is only entitled to lost profits for sales it could have actually made.  You should consider whether American

14

Seating has proven that it had the manufacturing capacity and the marketing capability to make the sales it says it lost. American Seating must prove that it was more likely than not that it could have made, or could have had someone else make for it, the additional products it says it could have sold but for the infringement.  American Seating also must prove that it had the capability to market and sell the additional patented products.

[Sales of VPRo II]

American Seating also seeks to recover profits it claims it lost due to USSC's offer to sell its VPRo I when, prior to delivery, the order was changed to the noninfringing VPRo II.

To recover any lost profits as a result of each such offer to sell, American Seating must show that USSC made an offer to sell the VPRo I to a customer, that the customer agreed to purchase the VPRo I, that USSC substituted the VPRo II when it delivered the product, and that but for the offer to sell the VPRo I, American Seating would have made that sale.

You must determine what the customer would have done, and you must take into account the factors I will describe shortly.

[Convoyed Sales]

In this case, American Seating contends that the A.R.M. is ordinarily sold along with passenger seats.  To recover lost profits on sales of passenger seats, American Seating must prove two things.  First, that it is more likely than not that American Seating would have sold the passenger seats but for the infringement. Second, the passenger seats and the A.R.M. together must be analogous to components of a single assembly or parts of a complete machine, or they must constitute a functional unit.  American Seating may not receive lost profit damages for products that might be sold along with the A.R.M. for convenience or business advantage, but that are not functionally part of the A.R.M.  Damages for lost profits on lost collateral sales, if any, are calculated in the same manner as I just described for calculating lost profits on the patented product.

IX.  Decision Regarding Convoyed Sales

15

A.

A careful review of the record leads to the conclusion that ASC's proofs at trial were not sufficient for the jury to find that the tie-down and the passenger seats in a bus were "analogous to the components of a single assembly or part of a complete unit, or constituted a functional unit. These proofs, viewed in a light most favorable to ASC, established that more often than not tie-downs and passenger seats were purchased by bus manufacturers from the same company, either ASC or USSC, <u>as a matter of convenience</u> and that is the extent to which the tie-down and the passenger seats were associated. In light of the precedents, this association is an insufficient basis for a finding of convoyed sales.

Particularly the proofs showed that:

• Passenger seats are not part of the patented tie-down. The Abstract of the '038 patent makes this clear:

> Apparatus for securing one or more wheelchairs to a vehicle includes a plurality of straps for holding the wheelchairs to the vehicle. Some of the straps are attached to a movable element that can be moved into or out of the area to be occupied by the wheelchairs. This allows the area to be utilized by other passengers when no wheelchairs are present and also facilitates ingress and egress of the wheelchairs. In the preferred embodiment, movable elements, which carry housings for wheelchair-engaging belts and passenger restraint belts, are mounted to the side wall of the vehicle for pivotal movement about vertical axes between storage positions and operative positions. The apparatus allows an operator to quickly and easily secure or release a passenger in a wheelchair and maintains the integrity of the straps.

• The tie-down operates independently of the passenger seats (Tr. 6/20/06 - Cross-examination of David McLaughlin, p. 100, line 22; Merced dep. - page

16

20, lines 14-17).

- The specifications published by bus buyers do not designate a particular company's tie-down. (Tr. 6/20/06 - Cross-examination of David McLaughlin, page 96, lines 1-10; PX 13, PX 14 and PX 15).

- The specification published by bus buyers do not require that the passenger seats and tie-down be purchased from the same company. (Merced dep. - page 24, lines 3-9, page 26, lines 23-25, page 27, lines 1-7; Tr. 6/20/06 - Direct examination of Christian Hammarskjold, page 104, lines 7-17).

- Bus builders sometimes buy passenger seats and tie-downs from different companies. (Merced dep. - page 14, lines 16-22; Tr. 6/20/06 - Direct examination of Christian Hammarskjold, page 94, lines 9-21; page 105, lines 23-24).

- The in-Court demonstration of how a tie-down operates did not include passenger seats (Tr. 6/20/06 - Direct examination of David McLaughlin, pages 23-26).

- The brochures used by ASC and USSC display either tie-down or passenger seats; they do not display the two in combination. (DX 6, DX 201, DX 306, DX 367, DX 368, DX 369, DX 372.)

- A press release relating to ASC's newest model passenger seats makes no mention of a tie-town.

B.

Ralph Merced, maintenance manager for the City of Santa Monica, of the '038 patent testified:

Q      Is it unusual for the same company to supply both the wheelchair securement and the passenger seats on a particular order?

* * *

A      It is not.

Q      Is that standard practice?

A      Yes, it is.

Q      Is that a practice that Santa Monica Big Blue Bus follows?

A      Yes.

* * *

A      Again, for commonality, consistency, one-stop shopping, if you will.   I don't have to concern myself with integrated components.  If one piece fails, I don't have to debate it with the other person's integrated system that is finger-pointing to go on.  If I have both components built by the same – or provided by the same manufacturer and just go to one person for the source of support.

(Dep. of Merced, page 14-15.)

He also testified:

Q      But on the passenger seats, it doesn't matter if they are in there or not, that doesn't effect how the arm works?

A      That is correct.

(Dep. of Merced, page 20, lines 14-17).

* *

Q      There is nothing in the Santa Monica bid specification or procurement roles that says the seats and restraint devices have to come from the same company, is there?

A      That is correct.

18

Q       There is no law that says that?

A       That is correct.

(Dep. of Merced, page 24, lines 3-9).

\* \* \*

Q       If someone were to say, "There is a rigid requirement or rule in your business that seats and restraints have to come from vendor and only one vendor," you wouldn't agree with that?

A       Depends who told me that.  If I'm required by our city to do so, I do it.

Q       But your city doesn't require that?

A       It does not.

Q       Okay.  And you know of no such requirement?

A       I do not know of any.

(Dep. of Merced, page 26-27).

James A. Ditch, Director of Maintenance for the Long Beach Transit Authority and

a co-inventor of the '038 patent testified:

Q       By the way, just switching gears just for a minute here.  You told us that all of the Long Beach Transit Authority buses have the American Seating telescoping restraint device which we've marked as Exhibit 48; is that right?

A       Yes.

Q       Having been at Long Beach when we visited in August, I know that a number of the Long Beach buses have seats made by my client, USSC Group; is that right?

A       Yes.

Q       I mean, there's nothing that says you have to buy the seats from the same company that you buy the restraints from?

19

A     No.

(Tr. 6/22/06 - Dep. of James Ditch, page 63, lines 5-16).

David McLaughlin, an ASC vice president, testified:

Q     * * * Describe for the jury the contacts or dealings that American Seating had with USSC relating to your realization that you had a competitor on that procurement?

* * *

A     Once it was clear that NABI intended on giving the award for Los Angeles County to USSC and that USSC had developed a spec-compliant securement system, Christian Hammarskjold and I started to discuss a couple of areas of that procurement that, again, based on the specification, we were going to cross paths via an infringement, and so we had some preliminary discussions to deal with those two areas, neither one of which went anywhere, but we were actively discussing making and supplying products that he would. . .need in order to execute that contract.

* * *

Q     Can you describe what the substance of the communication was between yourself and Mr. Hammarskjold relative to this LA procurement?

A     * * * We had extended an offer. . .that we would be willing to supply. . .the vandal-resistant inserts that were included in the specification and the securement restraint systems as part of that order, and this suggestion was made in writing in July of '01.

(Tr. 6/20/06 - Direct examination of David McLaughlin, page 40-41).

C.

All of the foregoing establishes that the relationship between the tie-down and the passenger seats is not functional. Although the tie-down and seats are often sold together, the sale is not the result of a need to function together, but rather as a convenience to the customer. This evidence is insufficient evidence as a matter of law to support a finding of

20

a convoyed sale.  As such, the jury's verdict cannot stand.

X.  Decision Regarding Lost Profits

USSC contends that it is entitled to a judgment as a matter of law on ASC's claim that it is entitled to damages on USSC's sale of the VPRo I and also on the sale of the VPRo IIs which were delivered to customers who initially ordered the VPRo I since its proofs fell short of what is required in the circumstances, and in the alternative a new trial on these issues.  USSC is wrong on both contentions.  The proofs at trial were such that the jury would reasonably have found that in both situations ASC lost sales of its tie-in to the customers of USSC who purchased the VPRo I and the VPRo II, and in any event the Court is not offended by the verdict in each situation.  No extended discussion is necessary.

As noted above, the jury was instructed on loss profits without objection as follows:

> Lost sales are those sales the patent owner lost because of the infringement.

> To prove that it lost sales, American Seating must prove that it was more likely than not that it would have made additional sales if USSC had not made the sales of the VPRo I.

* * * *

> American Seating also seeks to recover profits it claims it lost due to USSC's offer to sell its VPRo I when, prior to delivery, the order was changed to the non-infringing VPRo II.

> To recover any lost profits as a result of each such offer to sell, American Seating must show that USSC made an offer to sell the VPRo I to a customer, that the customer agreed to purchase the VPRo I, that USSC substituted the VPRo II when it delivered the product, and that but for the offer to sell the VPRo I, American Seating would have made that sale.

> You must determine that the customer would have done, and

21

you must take into account the factors I will describe shortly.

These instructions are consistent with the precedent.

In <u>Grain Processing Corp. v. American Maize Products Co.</u>, 185 F.3d 1341, 1349

(Fed. Cir. 1999), the Federal Circuit said:

> To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits. <u>See</u> <u>King Instruments Corp. v. Perego</u>, 65 F.3d 941, 952, 36 USPQ2d 1129, 1137 (Fed. Cir. 1995). When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement. <u>See id</u>; <u>Rite-Hite</u>, 56 F.3d at 1545. Once the patent owner establishes a reasonable probability of "but for" causation, "the burden then shifts to the accused infringer to show that [the patent owner's 'but for' causation claim] is unreasonable for some or all of the lost sales." <u>Id</u>. at 1544.

The evidence at trial established the following:

• ASC had 85% to 90% of the tie-in business.

• Specifications by and large called for the A.R.M. tie-in. (Tr. 6/20/06 - Direct examination of David McLaughlin, page 31, lines 8-25; page 32, lines 1-20; PX 13, PX 14; PX 15; and dep. of Dennis Howard pages 10-12).

• There were only three arm-leg type tie-ins available: TSIs 5800, VPRO I and the A.R.M. The TSI was not generally acceptable (Tr. 6/20/06 - Direct examination of David McLaughlin, page 29, lines 2-25, page 30, lines 1-2).

Therefore it was an essentially two product market.

In a two product market, a customer either had to buy the VPRo I or the ASC device.

Sales of the VPRo I, an infringing device, in such circumstances is the measure of ASC,

the patent owner's, damages.

A further description of the evidence at trial is not necessary to support either setting

aside the verdict on lost profits damages or offering or selling the VPRo I by USSC. ASC's

Response to Defendant's Brief in Support of The Motion for Judgment as a Matter of Law, New Trial or Remittitur of the Jury Verdict at pages 13-24 marshals the evidence very well on ASC's damages award and is incorporated by reference.  Briefly,

- USSC continued to sell the VPRo I until March, 2004 (Tr. 6/21/06 - Cross examination of Christian Hammarskjold, page 140, lines 3-25, page 141, lines 1-15).

- USSC shifted orders calling for the VPRo I to the VPRo II after March 16, 2004.

- PX 8, an e-mail to USSC's salespeople read in part as follows:

  > 1.  VPRo II will be the standard ADA system supplied by USSC.  VPRo I will no longer be available at this time. All orders that are in-house need to be readdressed with customers.   All orders quoted that are awarded to USSC will have the VPRo II.

Additionally, Christian Hammarskjold testified:

THE COURT:        Up until the end of 2001 the customer who ordered from you a restraint device anticipated or expected if they had done any business with you to receive the VPRo I device; is that a fair statement?

THE WITNESS:     They expected to get a VPRo.

THE COURT:        Well, but it was the configuration of the VPRo I?

THE WITNESS:     Yes.

(Tr. 6/21/06 - Direct examination of Christian Hammarskjold, page 142, lines 12-19).

Overall, substantial evidence supports the jury's verdict that American Seating would have made additional sales but for the infringement and therefore it is entitled to lost profits arising therefrom.

## XI.  Decision Regarding the Testimony of ASC's Expert

23

USSC also asserts that it is entitled to a new trial because the Court erred in allowing Kathleen Kedrowski, ASC's expert, to testify in its case in chief, since she was not identified as a witness until March 27, 2006, and then only as a rebuttal witness. USSC says:

> The jury's verdict reflects the harm to USSC. Although Kedrowski was offered to "fill the hole" in American Seating's case in chief on a reasonable royalty theory of recovery, she was allowed to testify on lost profits after the jury heard from Mr. McLaughlin on that same issue. Her testimony on both issues was not necessary. As a result, she was able to bolster McLaughlin's testimony on lost profits effectively giving American Seating two chances to prove its damages case against USSC without notice.

USSC does not explain how the jury's verdict might have been different had Kedrowski first testified in rebuttal.

Fed. R. Evid. 611(a) gives a court broad discretion with regard to "the mode and order of interrogatory witnesses and evidence." Here there was no indication of jury confusion or unfair prejudice.

Kedrowski's testimony was not a surprise to USSC. She was listed as an expert witness prior to the final pretrial conference. She filed a written report. She was examined pretrial two weeks before trial for six hours. She began her direct testimony on the third day of trial and completed it on the fourth day. USSC had ample time overnight to assess the first part of her testimony. It did not ask for a recess or adjournment to allow it to assess the second part of her testimony before cross-examination. As such, USSC is not entitled to a new trial based on the Court's allowance of Kedrowski's testimony. See Berrojle v. Hertz, 672 F.2d 334, 339 (3d Cir. 1982) (discussion of the court's broad discretion in a similar situation).

24

XII.  Decision Regarding Improper Jury Instructions

A.

USSC takes issue with two of the instructions to the jury.

The first instruction is the definition of the patented product.  It reads:

> The patented product at issue in this case is American Seating's A.R.M. wheelchair restraint system that includes the restraint, belts, and barrier.  It does not include the passenger seats.

The second instruction relates to lost profits on sales of the VPRo II.  The sales of VPRo II are a measure of damages predicated on an initial sale of the VPRo I and then switched on delivery to the VPRo II.  The instruction reads:

> American Seating also seeks to recover profits it claims it lost due to USSC's offer to sell its VPRo I when, prior to delivery, the order was changed to the non-infringing VPRo II.

> To recover any lost profits as a result of each such offer to sell, American Seating must show that USSC made an offer to sell the VPRo I to a customer, that the customer agreed to purchase the VPRo I, that USSC substituted the VPRo II when it delivered the product, and that but for the offer to sell the VPRo I, American Seating would have made that sale.

> You must determine what the customer would have done, and you must take into account the factors I will describe shortly.

As to the first instruction, USSC says it was reversible error to include in the definition of the patented product the belts and barrier (and also the passenger flip-up seats which this Court did not do), and as to the second instruction, it was reversible error not to include the phrase "without consent of the customer."

Only a short discussion is required of USSC's argument.  As stated in Romanski v. Detroit Entertainment, LLC, 428 F.3d 629, 641 (6th Cir. 2005), the goal of instructions is

25

to "adequately inform the jury of the relevant considerations," and a jury verdict will be reversed "on account of instructional error 'only in situations where the instruction viewed as a whole is confusing, misleading and prejudicial.'" (citations omitted).  The trial court has broad discretion regarding jury instructions.  Smith v. Botsford General Hospital, 419 F.3d 513, 520 (6th Cir. 2005).

Both the VPRo I and VPRo II were dealt with at trial as devices which included the metal arm and the associated belts and the barrier.  Nowhere in the evidence was any distinction made between these three components in terms of a specification, an order, the price or the delivery.  No witness made any distinction between the three components. Moreover, Claim 1 of the '038 patent included these components in combination.  So far as the Court can discern, USSC's assertion that the '038 patent be limited to include only the restraint structure itself is the first time in the long history of this case that the assertion was raised.  A fair reading of the Court's finding of literal infringement, American Seating Co. v. USSC Group, 2005 WL 1224603 (W.D. Mich. May 23, 2005), confirms this view.

The second objection also lacks merit.  As discussed above, ASC persuaded the jury by its evidence that it was more likely than not that it would have made the VPRo II sales in the circumstance of USSC winning the business on the basis of offering the VPRo I and then delivering the VPRo II.  There was no evidence in the record to suggest that the jury was misled by not including the phrase "without the consent of the customer."

XIII.  Conclusion

With this and the other orders entered this date pertaining to prejudgment interest, injunctive relief, and staying execution of the judgment, this case, which was filed September 7, 2001, is now at an end except for ASC's claim that USSC infringes its U.S. Patent No. 5,061,539 and 4,417,931 for vandal-resistant upholstered seats, which is the subject of a bifurcated proceeding.

Two observations are in order relating to the trial which is the subject of this decision.

First, USSC failed to come to grips with the fact that the VPRo I infringed the '508 patent, and therefore it had to account for the profits ASC would have made had USSC's customers which purchased the VPRo I.  Instead, USSC doggedly tried in every way possible to denigrate ASC's right to lost profits because of the infringing activities.

Second, the record was deficient because of the parties' failure to bring to the attention of the jury the specifications, purchase orders, and invoices relating to each of the infringing sales.  Rather, the parties depended on a truncated set of such documents requiring a considerable amount of interpretation.  Notwithstanding, the jury worked through the evidence at trial and came to a reasoned conclusion as to ASC's lost profits on the offering or sale of the VPRo I.  The jury went awry on convoyed sales because of the gloss ASC was able to put on the manner in which bus manufacturers generally did business with seat manufacturers.  The jury fell short in fully appreciating the considerable burden on a patent holder to extend its losses on infringement to non-patented devices.

Be all this as it may, the Court is satisfied with the conclusion that USSC has given it no good reason to set aside the verdict or require a second jury to look at the issues,

except for convoyed sales.

An amendment to the Consolidated Amended Final Judgment of July 17, 2006 will
be entered, awarding ASC's damages in the amount of $676,850.00.

SO ORDERED.


 s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  August 24, 2006


I hereby certify that a copy of the foregoing document was mailed to the parties of record
on this date, August 24, 2006, by electronic and/or ordinary mail.

 s/Julie Owens
Case Manager, (313) 234-5160